1   Michael Rubin (S.B. No. 80618)
    Scott A. Kronland (S.B. No. 171693)
2   Eileen Goldsmith (S.B. No. 218029)
    ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
3   177 Post Street, Suite 300
    San Francisco, California 94108
4   (415) 421-7151 - Office
    (415) 362-8064 - Fax
5
    Theresa M. Traber (S.B. No. 116305)
6   Vanessa H. Eisemann (S.B. No. 210478)
    Stefanie Kim Gluckman (S.B. No. 219788)
7   TRABER & VOORHEES
    128 N. Fair Oaks Avenue, Suite 204
8   Pasadena, California  91103
    (626) 585-9611 - Office
9   (626)577-7079 - Fax
10  Albert H. Meyerhoff, Esq.  (S.B. No. 54134)
    MILBERG WEISS BERSHAD HYNES & LERACH, LLP
11  355 South Grand Avenue, Suite 4170
    Los Angeles, California  90071
12  (213) 617-9007 - Office
    (213) 617-9185 - Fax
13
    (Additional counsel on following page)
14

15  Attorneys for Plaintiffs PAUL VELIZ, et al.

16

17                    UNITED STATES DISTRICT COURT

18            FOR THE NORTHERN DISTRICT OF CALIFORNIA

19

20

21  PAUL VELIZ, et al.,                    )  CASE NO. C 03-01180 SBA
                                           )
22                      Plaintiffs,        )
                                           )
23          v.                             )  **PLAINTIFFS' SUPPLEMENTAL**
                                           )  **REPLY BRIEF REGARDING**
24                                         )  **DEFENDANT CINTAS**
    CINTAS CORPORATION, et al.             )  **CORPORATION'S MOTION TO**
25                                         )  **COMPEL ARBITRATION**
                 Defendants.               )
26  _____    )  Hearing Date: December 16, 2003
                                           )  Time:         1:00 p.m.
27                                         )  Place:        Oakland, Courtroom 3
                                           )
28

1    Steven W. Pepich (S.B. No. 116086)
     Michelle Ciccarelli (S.B. No. 167578)
2    Patrick Daniels (S.B. No. 190715)
     MILBERG WEISS BERSHAD HYNES & LERACH, LLP
3    401 B Street, Suite 1700
     San Diego, California 92101-4297
4    (619) 231-1058 - Office
     (619) 231-7423 - Fax
5
     Nancy Juda, Esq.  (S.B. No. 445487)
6    MILBERG WEISS BERSHAD HYNES & LERACH, LLP
     1100 Connecticut Ave., N.W., Suite 730
7    Washington, D.C. 20036
     (202) 822-2024- Office
8    (202) 828-8528- Fax

9    Attorneys for Plaintiffs PAUL VELIZ, *et al.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page(s)

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

I.   ALL CINTAS DRIVERS ARE "TRANSPORTATION WORKERS" WHO ARE
     EXEMPT FROM THE FEDERAL ARBITRATION ACT . . . . . . . . . . . . . . . . . . . . . . . 1

     A.   The Term "Seamen" Includes Persons Working In Any Capacity
          on a Covered Ship, Without Regard To Whether They Are
          Actually Involved in Transportation Duties or Employed by
          Common Carriers to Transport Goods Owned by Third Parties. . . . . . . . . . . . . 3

     B.   The Term "Railroad Employees" Includes Workers Who Do Not
          Actually Move Goods In the Interstate Channels of Commerce  . . . . . . . . . . . . 7

     C.   Had It Intended to Exempt Only Employees of Common Carriers,
          Congress Would Have Used Explicit Language to Accomplish
          That Purpose. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     D.   Section 1 of the FAA Exempts "Classes" of Employees.  . . . . . . . . . . . . . . . . . 9

     E.   Substantial Evidence Shows that All Cintas Drivers Fall Within A
          "Class" of Workers Who Are Exempt from the FAA.  . . . . . . . . . . . . . . . . . . 10

II.  CINTAS' ARBITRATION MOTION DID NOT RELY ON STATE
     ARBITRATION STATUTES SO ITS MOTION MUST BE REJECTED . . . . . . . . . . 11

III. WITHOUT THE FAA, ARBITRATION OF PLAINTIFFS' FLSA CLAIMS
     CANNOT BE COMPELLED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.  ARBITRATION MAY NOT BE COMPELLED UNDER THE LAW OF ANY
     STATES RELEVANT HERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

V.   THE INAPPLICABILITY OF THE FAA ONLY STRENGTHENS PLAINTIFFS'
     ARGUMENT THAT THE COURT SHOULD STAY ANY ARBITRATION,
     NOT THE CONTINUED LITIGATION OF THIS CASE . . . . . . . . . . . . . . . . . . . . . . 15

1

## TABLE OF AUTHORITIES

2

Page(s)

3

FEDERAL CASES

4

*Adkins v. Labor Ready, Inc.*, 303 F.2d 496, 505-506 (4th Cir. 2002) . . . . . . . . . . . . . . . . 10, 11

5

*Amalgamated Ass'n of Street, Electric Ry and Motor Coach Employees v. Pa. Greyhound
Lines, Inc.*, 192 F.2d 310, 313-14 (3rd Cir. 1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

6

7

*American Postal Workers Union v. U.S. Postal Service*, 823 F.2d 466, 473 (11th Cir. 1987) . 10

8

*Asplundh Tree Expert Company v. Bates*, 71 F.3d 592, 601, 603 (6th Cir. 1995) . . . . . . . . . 10

9

*Bacashihua v. U.S. Postal Service*, 859 F.2d 402, 404-5 (6th Cir. 1988) . . . . . . . . . . . . . . . . 10

10

*Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740-45 (1981) . . . . . . . . . 12, 13

11

*Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 704-705 (1945) . . . . . . . . . . . . . . . . . . . . . . 12

12

*Brown v. Nabors Offshore Corporation*, 339 F.3d 391 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . 6

13

*Buckley v. Nabors Drilling USA, Inc.*, 190 F.Supp. 2d 958, 965 n.2 (S.D.Tex. 2002) . . . . . . . 6

14

*Carumbo v. Cape Cod S.S. Co.*, 123 F.2d 991, 995 (1st Cir. 1941) . . . . . . . . . . . . . . . . . . . . . 5

*Central States, Southeast and Southwest Areas Pension Fund v. Tank Transport, Inc.*,
779 F.Supp. 947, 951 (N.D. Ill. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

15

*Chappel v. Laboratory Corp. of America*, 232 F.3d 719, 725 (9th Cir. 2000) . . . . . . . . . . . . 12

16

*Circuit City Stores, Inc. v. Adams*, 352 U.S. 105 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 13

17

*Colomb v. Texaco, Inc.*, 736 F.2d 218, 220-221 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . 5

18

19

*Delpro Co. v. Brotherhood Ry. Carmen of U.S. and Canada, AFL-CIO*, 676 F.2d 960
(3rd Cir.) cert. denied, 459 U.S. 989, 103 S.Ct. 343 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

20

*Gagnon v. Service Trucking Inc.*, 266 F.Supp. 2d 1361, 1364 (M.D.Fla. 2003) . . . . . . . . . 8, 10

21

*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26-27 (1991) . . . . . . . . . . . . . . . . . . 13

22

*Harden v. Roadway Package Sys., Inc.*, 249 F.3d 1137 (9th Cir. 2001) . . . . . . . . . . . . . . . 8, 11

23

*Int'l Longshoremen's Ass'n v. North Carolina State Ports Authority*, 370 F.Supp. 33
(E.D. N.C. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

24

*Int'l Stevedoring Co. v. Haverty*, 272 U.S. 50 (1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

25

*Kropfelder v. Snap-on Tools Corp.*, 859 F.Supp. 952, 958 (D.Md. 1994) . . . . . . . . . . . . . . . 11

26

*McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991) . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

27

28

Page(s)

*Offshore Co. v. Robinson*, 266 F.2d 769, 771 (5th Cir. 1959) . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Pacific Merchant Shipping Association*, 918 F.2d 1409, 1412 (9th Cir. 1990) . . . . . . . . . . . . . 5

*Palcko v. Airborne Express, Inc.*, 2003 WL 21077048 (E.D.Pa. 2003) . . . . . . . . . . . . . . . . . 10

*Pittman v. Nabors Offshore Drilling, Inc.*, 2003 WL 21018856 (E.D.La. 2003) . . . . . . . . . . . 6

*Rosen v. Transx, Ltd.*, 816 F. Supp. 1364, 1371 (D.Minn. 1993) . . . . . . . . . . . . . . . . . . . . . . 10

*Summerlin v. Massman Construction Co.*, 199 F.2d 715 (4th Cir. 1952) . . . . . . . . . . . . . . . . 5

*System Federal No. 40, Railway Employees Dept. of American Federation of Labor v. Virginian Ry. Co.*, 11 F.Supp. 621 (E.D.Va. 1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Tenney Engineering, Inc. v. United Electrical Radio & Machine Workers of America*, 207 F.2d 450, 452 (3rd Cir. 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Wilkes v. Mississippi River Sand & Gravel Co.*, 202 F.2d 383 (6th Cir. 1953) . . . . . . . . . . . . 5

*Wright v. Universal Maritime Service Corp.*, 525 U.S. 70, 76-77 (1998) . . . . . . . . . . . . . . . . 13


STATE CASES

*Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789, 797 (Colo. App. 2001) . . . . . . . . 15

*Blue Cross of Cal. v. Sup. Ct. (Farquhar)*, 67 Cal.App.4th 42, 47 (1998) . . . . . . . . . . . . . . . 15

*Burch v. Second Judicial Dist. Court ex rel. County of Washoe*, 49 P.3d 647, 650 (Nev. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*City & County of Denver v. Dist. Court*, 939 P.2d 1353, 1364 n.11 (Colo. 1997) . . . . . . . . . . 14

*Discover Bank v. Shea*, 362 N.J.Super. 200, 208 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Fastenberg v. Prudential Ins. Co.*, 707 A.2d 209 (N.J. Super. App. Div. 1998) . . . . . . . . . . . 14

*Fink v. Golubock*, 680 A.2d 1243, 1250-52 (Conn. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Flyer Printing Company, Inc. v. Hill*, 805 So.2d 829 (Fla. Ct. App. 2001) . . . . . . . . . . . . . . 14

*Flynn v. Labor Ready, Inc.*, 751 N.Y.S.2d 722 (N.Y. Sup. 2002) . . . . . . . . . . . . . . . . . . . . . . 14

*Gadsden Budweiser Distributing Company, Inc.*, 807 So. 2d 528 (Ala. 2001) . . . . . . . . . . . . . 8

*Mislenkov v. Accurate Metal Detinning, Inc.*, 743 N.E.2d 286, 288 (Ind. App.  2001) . . . . . . 14

*Obstetrics and Gynecologists v. Pepper*, 693 P.2d 1259 (Nev. 1985) . . . . . . . . . . . . . . . . . . . 14

Page(s)

*Pioneer Take Out Corp v. Bhavsar*, 209 Cal.App.3d 1353, 1358 (1989) . . . . . . . . . . . . . . . . . . 15

*Rauh v. Rockford Prods. Corp.*, 574 N.E.2d 636 (Ill. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Wachter v. UDV North America, Inc.*, 816 A.2d 668 (Conn. App. 2003) . . . . . . . . . . . . . . . . 14


FEDERAL STATUTES

Federal Arbitration Act, 9 U.S.C. §1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    passim

Act of July 15, 1913, Ch. 6, § 1, 38 Stat. 103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Hours of Service Act, Ch. 2939, 34 Stat. 1415, 1415-17 (1907) . . . . . . . . . . . . . . . . . . . . . . 9

Railway Labor Act, 45 U.S.C. § 151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8


STATE STATUTES

Mich. Comp. Laws § 423.9(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

1       Plaintiffs Paul Veliz, *et al.*, submit this brief to respond to defendant Cintas Corporation's

2   Supplemental Brief, filed pursuant to this Court's  November 4, 2003 order.  ("Cintas Brief").

3   **I.**    **ALL CINTAS DRIVERS ARE "TRANSPORTATION WORKERS" WHO ARE EXEMPT FROM THE FEDERAL ARBITRATION ACT**

4       Cintas misreads the Supreme Court's opinion in *Circuit City Stores, Inc. v. Adams*, 352

5   U.S. 105 (2001) and ignores the established meaning of key statutory terms.  There is no statutory

6   language or case law supporting Cintas' argument that "the residual clause of the FAA exemption

7   is limited only to those who are transportation workers actually engaged in the transportation

8   industry."  Cintas Brief at 2.  To the contrary, the statutory analysis dictated by the Supreme Court

9   in *Circuit City* necessarily leads to the conclusion that all Cintas drivers are transportation workers

10   excluded from the FAA by the Section 1 exemption.

11       FAA's § 1 exempts from coverage all "contracts of employment of seamen, railroad

12   employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. §1.

13   In *Circuit City*, the Supreme Court held that § 1 exempts "only contracts of employment of

14   transportation workers."  *Id.*, 352 U.S. at 119.  In coming to this conclusion, the Court rejected the

15   employee's argument that the residual clause, "any other class of workers engaged in foreign or

16   interstate commerce," should be read to encompass all employment contracts and held that such an

17   interpretation conflicted with the language of § 1, which dictated the proper construction of the

18   residual clause without reference to legislative history.  *Id.*, at 114, 119.

19       Because the residual clause followed explicit references to "seamen" and "railroad

20   workers," the Court explained that "[t]he wording of § 1 calls for the application of the maxim

21   *ejusdem generis*, the statutory canon that '[w]here general words follow specific words in a

22   statutory enumeration, the general words are construed to embrace only objects similar in nature to

23   those objects enumerate by the preceding specific words.'" *Id.* at 114-115 (citations omitted).  In

24   keeping with this canon, the Court held that the residual clause with respect to "any other class of

25   workers" must be "read to give effect to the terms 'seamen' and 'railroad employees,' and should

26   itself be controlled and defined by reference to the enumerated categories of workers which are

27   recited just before it."  *Id.* at 115.

28       Because there was no argument that the salesperson in *Circuit City* was a "transportation

worker" akin to "seamen" and "railroad employees," the Court was not called upon to address the scope of the "transportation workers" exemption.  Still, there is no question under the Supreme Court's reasoning in *Circuit City* that any such refinement must be accomplished by examining the nature and scope of the "enumerated categories" of "seamen" and "railroad employees" and using them to define the nature and scope of the other classes of "transportation workers" who are similarly exempt from the FAA.  *Id.* at 114-5.

Rather than exploring the meaning of these statutory terms, Cintas ignores the teaching of *Circuit City* and resorts to a general discussion of the FAA's pro-arbitration purpose and the federal statutory schemes for dispute resolution available to "seamen" and "railroad employees." Cintas Brief at 3-4.  But this discussion provides no clues as to the classes of "transportation workers" whom Congress intended to exempt from the FAA.[1]  Cintas then asserts that a "transportation worker" is an employee of an "enterprise[ ] in the business of transportation (often common carriers), engaged in transporting goods which are owned by third parties or the general public (*i.e.*, not owned by those employees' employer), who have paid the employer to transport the goods in foreign or interstate commerce and to deliver them somewhere else." *Id.* at 6-7.  But Cintas attempts to engraft this "common carrier" limitation onto § 1 without analysis of the statutory terms or citation to a single case.

Pursuing the analysis mandated by the Supreme Court, this Court must find that Cintas drivers are "transportation workers" within § 1's residual clause.  Defining this clause by reference to the specific classes of "seamen" and "railroad employees," "transportation workers" necessarily include two groups of workers: (1) the class of employees, like "seamen," who work on board a vehicle or vessel in the flow of commerce and perform job duties that contribute to the employer's mission in operating that vehicle or vessel; and (2) the class of employees, like "railroad employees," who perform any of a number of different job functions for companies transporting goods or people in commerce.  As truck drivers who deliver Cintas products to further its sales

---

[1]  Certainly it cannot be argued that existing regulation by Congress is the touchstone for finding a "transportation worker," since the only employees who had federally-sanctioned dispute resolution procedures in or about 1925 were the "seamen" and "railroad employees" specifically mentioned in the statute.  Such an argument would write the residual clause out of the statute.

objectives, plaintiffs are "transportation workers" who resemble both "seamen" and "railroad employees" and thus, are exempt under § 1 of the FAA.

### A.   The Term "Seamen" Includes Persons Working In Any Capacity on a Covered Ship, Without Regard To Whether They Are Actually Involved in Transportation Duties or Employed by Common Carriers to Transport Goods Owned by Third Parties.

Without examining the meaning of "seamen" under general maritime law and relevant federal statutes, Cintas asserts that all seamen "work for transportation businesses engaged in transporting third parties' goods in international commerce." Cintas Brief at 8. This is simply untrue. The term "seamen" has long embraced a wide variety of workers including those employed on fishing boats that transported no goods for other companies, as well as persons who perform work on barges and oil rigs in connection with dredging operations and off-shore oil production, *i.e.*, seamen who do not transport anything and who do not work for a common carrier.

Since the FAA does not reference any statutory definition for the term "seamen," it is proper to examine who was a seaman under general maritime law when Congress enacted the FAA in 1925. This is virtually the same task undertaken by the Supreme Court in *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991), where the Court sought to define the scope of "seamen" under maritime law when the Jones Act was passed in 1920 without any statutory definition. After surveying maritime law from the 19th and early 20th century, the Court concluded that by 1920, "general maritime law did not require that a seaman aid in navigation. It was only necessary that a person be employed on board a vessel in furtherance of its purpose." *Id.* at 346. Workers encompassed within the term "seamen" included coopers who made barrels in aid of whaling, ship-carpenters who repaired the ship, and cooks, chambermaids and waiters who served the crew or passengers, just to name a few. *Id.* at 343-345. What is more, the ship on which a "seaman" worked did not have to be engaged in the transportation of goods or passengers, since seamen were also employed on whaling ships, sealing boats, and other fishing vessels. *Id.* at 345, *quoting* E. Benedict, *American Admiralty* § 241, pp. 133-134 (1850). Thus, nothing in maritime law restricted "seamen" to those who worked for common carriers or to those who were directly involved in work related to navigation of the ship.

Nor did this expansive view of who was a "seamen" maritime law become constrained by federal regulation.  When the FAA was enacted in 1925, two federal statutes governed the employment of "seamen."  The first was the Shipping Commissioners Act of 1872 (SCA), which created officials called shipping commissioners whose charge was to supervise the hiring, wages and working conditions of seaman.  Dft's Exh. F.  The second was the Jones Act, which passed as part of the Merchant Marine Act of 1920[2] to provide a "seaman" the right to seek damages arising from negligence of the owner or personnel of a vessel on which the seaman is employed.[3]  *Offshore Co. v. Robinson*, 266 F.2d 769, 771 (5th Cir. 1959).

The SCA broadly swept under its protection an expansive class of "seamen," including "every person (apprentices excepted) who shall be employed or engaged to serve in any capacity on board" a ship covered by the SCA.  Dft. Exh. F, § 65.  A "ship" under the SCA "shall be taken and understood to comprehend every description of vessel navigating on any sea or channel, lake or river, to which the provisions of this law may be applicable."  Similarly, a "master" of a ship covered by the SCA includes "every person having command of any ship belonging to any citizen of the United States."  *Id.*  Thus, with certain limited exceptions,[4] the term "seamen" embraced every worker on board any American vessel on any body of water, regardless of the type of work performed by that worker.  Mirroring general maritime law, the SCA explicitly recognized that workers engaged in fishing and related activities are also "seamen" within the statutory meaning.  *Id.,* § 40.  Like the relevant principles under maritime law, the language of the SCA does not

---

[2] 41 Stat. 1007, 46 U.S.C.A. § 688.

[3] While the Supreme Court in *Circuit City* focused on protections seamen enjoyed under the SCA, the impact of a federal arbitration statute on the Jones Act was also a concern at the time Congress was considering passage of the FAA.  In a report to the International Seamen's Union during their annual convention in 1923, the union's president criticized the federal arbitration bill as a tool for undermining statutory protections for seamen and causing the "reintroduction of forced or involuntary labor, if the freeman through his necessities shall be induced to sign."  Dft's Exh. J, at 203.  It was argued that where an arbitration clause was added to the seaman's labor contract, "the seaman's right to wages, to food, to damages under the Jones Act, together with his present right to quit work in harbor, becomes void."  *Id.* at 204.

[4] While SCA generally regulates workers on any "vessel navigating on any sea or channel, lake or river," for example, Congress carved out an exception for those in the "lake-going trade touching at foreign ports or otherwise."  Dft. Exh. G.

permit the limiting construction proposed by Cintas, because there is nothing which defines "seamen" as those who transport the goods of third parties.  Moreover, the inclusion of seamen engaged in the fishing business shows that the SCA protects seamen whose work is unrelated to the transportation of goods.  The latter workers are "transportation workers" not because they transport goods, but because they work on ships in aid of their business purpose.

The Jones Act applies to "any seaman who shall suffer personal injury in the course of his employment."  The Act has always been construed liberally to provide claims for a broad class of workers.  *Offshore Company*, 266 F.2d at 773-4.  "Thus, in 1926, Mr. Justice Holmes, for the Supreme Court, held that a stevedore was a seaman under the Jones Act.  'Words are flexible,' the work of a stevedore is ' a maritime service formerly rendered by a ship's crew,' and Congress wanted to protect men engaged in the same maritime duties whether employed by a stevedore or a ship."  *Id., citing Int'l Stevedoring Co. v. Haverty*, 272 U.S. 50 (1926).  Continuing this trend, the First Circuit held in 1941 that any person "who does any sort of work aboard a ship in navigation is a 'seaman' within the meaning of the Jones Act."  *Carumbo v. Cape Cod S.S. Co.*, 123 F.2d 991, 995 (1st Cir. 1941).[5]  A Jones Act seaman need not do work that aids in the operation of a vessel as "a means of transport by water," as long as he or she contributes to the "function or mission of the special structure to which they [are] attached."  *Offshore Company*, 266 F.2d at 776 (laborer in a drilling crew working on mobile drilling platform for oil drilling and exploration company properly found to be a Jones Act seaman).[6]  Based on the meaning of "seamen" under admiralty law prior to the Jones Act's passage and on early judicial interpretation of the statute, the Supreme Court has held that a Jones Act seaman need not do work that aids in the navigation of a vessel;

---

[5]  *See also Colomb v. Texaco, Inc.*, 736 F.2d 218, 220-221 (5th Cir. 1984)(oilfield worker on drilling barge is a seaman); *Wilkes v. Mississippi River Sand & Gravel Co.*, 202 F.2d 383 (6th Cir. 1953)(laborers involved in dredging operations were "seamen"); *Summerlin v. Massman Construction Co.*, 199 F.2d 715 (4th Cir. 1952)(fireman on floating derrick used to pour concrete in connection with building a bridge held to be a Jones Act seaman).

[6]  The Ninth Circuit recognized this standard in *Pacific Merchant Shipping Association*, 918 F.2d 1409, 1412 (9th Cir. 1990), explaining: "As a matter of general maritime law, the term 'seamen' includes a broad range of marine workers whose work on a vessel on navigable waters contributes to the functioning of the vessel, to accomplishment of its mission, or to its operation or welfare."  (Citations omitted).

instead he or she must have an "employment-related connection" to such a vessel and contribute to its function or the accomplishment of its mission.  *McDermott Int'l*, 498 U.S. at 346, 353-5.

Courts addressing the issue have held that "the criteria for determining seaman status under the Jones Act should apply with equal vigor to § 1, such that a seaman under the Jones Act is also a seaman for purposes of exemption under  § 1 of the FAA."  *Buckley v. Nabors Drilling USA, Inc.*, 190 F.Supp. 2d 958, 965 n.2 (S.D.Tex. 2002).[7]  In so holding, these courts have rejected the argument that " § 1 refers only to seamen actually involved in the moving of goods," ruling instead that "[a] thorough and comprehensive reading of *Circuit City* facilely reveals that the text and legislative history of  § 1 support only one plausible interpretation of the statute's reference to seamen and railroad workers – namely, that  § 1 exempts from the FAA's coverage *all* seamen, as well as *all* railroad employees, by virtue of the fact that *all* seamen and *all* railroad employees are directly involved in the transport of goods in interstate commerce."  *Id.* at 961-962 (emphasis in original).  Applying the definition of "seamen" under general maritime law and the Jones Act, any worker who has an "employment-related connection" to a ship and contributes to its function or the accomplishment of its mission is, thus, deemed to be "directly involved in the transport of goods in interstate commerce" under the FAA.  *McDermott Int'l,* 498 U.S. at 353-355.

The definition of "seamen" under the Jones Act provides no support for Cintas' limiting construction of § 1.  All pertinent authority shows that a worker need not be actually engaged in moving goods to be a seaman.  Further, there is no suggestion in either the SCA, the Jones Act or maritime law principles that the class of seamen is limited to those who carry the goods of third parties.  On the contrary, these authorities support plaintiffs' argument that as drivers of trucks delivering goods to serve Cintas' sales objectives they are like seamen, because both classes of workers are employed aboard the employer's means of transport undertaking a job that furthers the mission sought to be accomplished through the use of that transportation vehicle.

---

[7]  *See also Brown v. Nabors Offshore Corporation*, 339 F.3d 391 (5th Cir. 2003); *Pittman v. Nabors Offshore Drilling, Inc.*, 2003 WL 21018856 (E.D.La. 2003).

**B.    The Term "Railroad Employees" Includes Workers Who Do Not Actually Move Goods In the Interstate Channels of Commerce.**

Unlike the term "seamen," the phrase "railroad employees" had no recognized common law meaning when the FAA was passed in 1925.  Nor was any definition of "railroad employees" included in the FAA.  Further, because it was the Seafarers International Union and not any brotherhood of railroad workers who objected to applying federal arbitration rules to their employment contracts, there is no legislative history that provides any clues as to the intended meaning or scope of the term "railroad employees."  Nor is there any reference in § 1 or any other part of the FAA to the Transportation Act of 1920 or to any other statutory scheme from which a definition might be drawn.  Even if there were such a reference, moreover, the Transportation Act contains no definitions for "railroad" or "employee."[8]

Looking simply at the words used, this class of workers seems to encompass all "employees" who work for a "railroad" without regard to the actual functions they serve.  This broad construction is also consistent with the statutes enacted in the 20s to regulate disputes between some classes of railroad workers and their employers.  There is nothing in the Transportation Act or in the Railway Labor Act of 1926 that restricts "railroad employees" to any subclass who "actually moved goods in commerce."  Instead, virtually all employees of a covered carrier are included in the scope of the statute.   Dft. Exh. J at 469; Railway Labor Act, 45 U.S.C. § 151.  In later cases construing these statutes, courts have ruled that covered railroad employees include workers involved in the receipt, delivery and elevation of property transported by rail and the repair and maintenance of railroad cars, even though they do not "actually move goods in commerce."[9]  Given this broad meaning of "railroad employees," it is plain that the residual clause

---

[8]  Title III of the Transportation Act of 1920, which deals with dispute resolution between carriers and their employees and subordinate officials, does define the term "carrier" to include "any carrier by railroad, subject to the Interstate Commerce Act, except a street, interurban, or suburban electric railway not operating as a part of a general steam railroad system of transportation."  Dft. Exh. J at 469.  This definition is of no use here, however, since the FAA does not refer to "carriers" or "carriers by railroad."

[9]  *Delpro Co. v. Brotherhood Ry. Carmen of U.S. and Canada*, *AFL-CIO*, 676 F.2d 960 (3rd Cir.) *cert. denied*, 459 U.S. 989, 103 S.Ct. 343 (1982); *Int'l Longshoremen's Ass'n v. North Carolina State Ports Authority*, 370 F.Supp. 33 (E.D. N.C. 1974); *System Federal No. 40, Railway Employees Dept. of American Federation of Labor v. Virginian Ry. Co.*, 11 F.Supp. 621

embraces all employees who work for companies which, like railroads, use transportation systems or vehicles as part of their business enterprise.

**C.     Had It Intended to Exempt Only Employees of Common Carriers, Congress Would Have Used Explicit Language to Accomplish That Purpose.**

Cintas' argument that the residual clause of § 1 should be limited to transportation workers employed by common carriers is grounded on cases in which employees were deemed to be exempt or non-exempt without regard to whether they worked for a common carrier or whether they transported goods owned by their employers.  *Id.* at 7-9.[10]   This approach is not only unpersuasive, it is contrary to the teaching of *Circuit City* and standard principles of statutory construction.  As the Supreme Court explained in *Circuit City*, the residual clause must be "read to give effect to the terms 'seamen' and 'railroad employees'" and "defined by reference to the enumerated categories of workers."  532 U.S. at 115.  To limit the residual clause to employees of common carriers would not give effect to the established meaning of the term "seamen" or to the broad spectrum of workers who are "railroad employees," nor would it create a definition grounded in and defined by both enumerated categories of workers referenced in the statute. Further, there is no question that Congress knew how to limit a statute's coverage to common carriers.  Not only did it do so in the Transportation Act of 1920, Congress used clear language in other legislation of the time in order to specify that only common carriers were included in its scope.[11]   In light of the language Congress regularly used to impose such a restriction, surely

---

(E.D.Va. 1935), *aff'd*, 84 F.2d 641 (4th Cir. 1936), *aff'd*, 300 U.S. 515, 57 S.Ct. 592 (1937).

[10]  *E.g., Harden v. Roadway Package Sys., Inc.,* 249 F.3d 1137 (9th Cir. 2001)(as a delivery driver who contracted to deliver packages through the U.S., plaintiff fell within class of "transportation workers"; no mention of company's status as common carrier); *Gadsden Budweiser Distributing Company, Inc.,* 807 So. 2d 528 (Ala. 2001)(because plaintiff was a sales director and then an area manager, he was not a transportation worker; no mention of fact that company was not a common carrier); *Gagnon v. Service Trucking Inc.*, 266 F.Supp. 2d 1361, 1364 (M.D.Fla. 2003)(plaintiff truck driver and all other truck driver employees constitute a class of workers who are exempt under § 1; no mention of common carrier status).

[11]  *See, e.g.,* Act of July 15, 1913, Ch. 6, § 1, 38 Stat. 103 ("The provisions of this chapter shall apply to any common carrier or carriers . . . engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water . . . "); Hours of Service Act, Ch. 2939, 34 Stat. 1415, 1415-17 (1907) (applying to "common carrier[s] . . . and [their] employees, engaged in the transportation of passengers or property by railroad" in interstate

Congress would have drafted the §1 exemption to encompass "seamen, railroad employees, and any other employees of common carriers engaged in interstate commerce" if it had intended to limit the residual clause to the employees of common carriers. That it did not do so is additional strong evidence that the residual clause should not be construed in such a restrictive manner.

**D.** **Section 1 of the FAA Exempts "Classes" of Employees.**

As plaintiffs argued in their initial supplemental brief, the language of §1 reveals congressional intent to exempt broad classes of workers, rather than requiring detailed analysis of the particulars of each employee's job duties. Pltfs' Supp. Brief at 3-6. The textual analysis proposed by plaintiffs is bolstered by an examination of the scope of the terms "seamen" and "railroad employees" undertaken above. As to both terms, the Courts have focused on the class of workers, not the individual characteristics of an employee's job, thus finding that all employees of a railroad and that all workers on a ship fall within the statutory definitions, even if they are not personally engaged in transporting goods. Plaintiffs also discussed opinions by three courts which have held that, since the exclusion under § 1 of the FAA pertains to classes of workers, not individuals, the issue is not whether the individual worker "actually engaged in interstate commerce," but whether the class of workers to which the complaining worker belonged did so.[12] Cintas does little to counter these arguments except to posit that "the term 'class of workers'

---

commerce"); Interstate Commerce Act, ch. 104, § 1, 24 Stat. 379 (1887) (applying "to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad; or party by water when both are used, under the common control, management, or arrangement, for a continuous carriage or shipment . . . "); Safety Appliance Act, ch. 196, § 1, 27 Stat. 531 (1893) (applying to every common carrier "engaged in interstate commerce by railroad"); FELA, ch. 149, §§ 1, 2, 35 Stat. 65 (1908) ("Every common carrier by railroad . . . "); Erdman Act, ch. 370, § 1, 30 Stat. 424 (1898) ("any common carrier or carriers and their officers, agents, and employees, except masters of vessels and seamen, . . . engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water," and defining employees to "include all persons actually engaged in any capacity in train operation or train service of any description"); Act of March 4, 1921, ch. 172, § 233, 41 Stat. 1445 (ICC shall formulate regulations for transporting explosives "which shall be binding upon all common carriers engaged in interstate or foreign commerce which transport explosives . . . ").

---

[12]  *See* Supp. Brief at 5, discussing *Bacashihua v. U.S. Postal Service*, 859 F.2d 402, 404-5 (6th Cir. 1988); *Palcko v. Airborne Express, Inc.*, 2003 WL 21077048 (E.D.Pa. 2003); and *Rosen v. Transx, Ltd.*, 816 F. Supp. 1364, 1371 (D.Minn. 1993).

should mean only that group of workers who actually move the goods of others" and to cite to cases which do not apply the analysis required under *Circuit City*.  Cintas Brief at 10.

Even before *Circuit City*, most courts analyzed the exemption issue as involving classes of workers.  In *Tenney Engineering, Inc. v. United Electrical Radio & Machine Workers of America,* 207 F.2d 450, 452 (3rd Cir. 1953), for example, the Court evaluated "seamen" and "railroad employees" as "class[es] of workers" who were engaged in interstate or foreign commerce and, applying the statutory maxim of *ejusdem generis*, found that the residual clause included "other classes of workers who are actually engaged in the movement of interstate commerce or in work so closely related thereto as to be in practical effect part of it."[13]  The same class-wide analysis has continued in the wake of *Circuit* City.  *See Gagnon*, 266 F.Supp. 2d at 1364 (plaintiff truck driver and all other truck driver employees constitute a class of workers who are exempt under §1); *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 505-506 (4th Cir. 2002) (analyzing the nature of the plaintiffs' job assignments as a class to determine that, since they do not engage in transportation-related tasks, they are not transportation workers under §1).

**E.**  **Substantial Evidence Shows that All Cintas Drivers Fall Within A "Class" of Workers Who Are Exempt from the FAA.**

Evidence in the record shows that Cintas route drivers work under virtually identical job descriptions that identify the job as "both a route delivery and customer service position."[14]  Each of the plaintiffs who submitted declarations in support of plaintiffs' motion for facilitated notice also reported that their primary job was "to deliver products to customers and service their

---

[13]  *See also Asplundh Tree Expert Company v. Bates*, 71 F.3d 592, 601, 603 (6th Cir. 1995)(holding that "highly paid executive" was part of a "class of workers actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are."); *American Postal Workers Union v. U.S. Postal Service*, 823 F.2d 466, 473 (11th Cir. 1987)(analyzing postal workers as a class to hold them to be "workers actually engaged in interstate commerce"); *Amalgamated Ass'n of Street, Electric Ry and Motor Coach Employees v. Pa. Greyhound Lines, Inc.*, 192 F.2d 310, 313-14 (3rd Cir. 1951)(holding FAA's § 1 applied because Greyhound's employees constituted a "class" within the meaning of the residual clause).

[14]  Exh. 8, pp. 69-124 and Exh. 10, p. 126, submitted as part of Plaintiffs' Exhibits in Support of Motion for Facilitated Notice, filed on July 2, 2003.  ("Notice Exhibits").

accounts."[15]  In addition, Cintas provided evidence that some of these Cintas drivers cross state lines as a regular part of their job duties and that others transport goods manufactured by Cintas and other companies and then shipped across state lines for delivery to Cintas customers.[16]  Based on this information, there is no question that Cintas route drivers are "transportation workers" within the meaning of the residual clause of § 1 of the FAA.  Like "seamen," they work on their employer's vehicles to further its business purposes.  Like "railroad workers," they are engaged in work that is part of their employer's regular use of transportation systems or vehicles to further its business enterprise.  As drivers who sometimes cross state lines and regularly transport goods that have been shipped across state lines, Cintas drivers constitute a class of transportation workers who are engaged in commerce within the meaning of § 1, and plaintiff are part of this class.[17]

## II.   CINTAS' ARBITRATION MOTION DID NOT RELY ON STATE ARBITRATION STATUTES SO ITS MOTION MUST BE REJECTED

*Harden v. Roadway Package Sys., Inc.,* 249 F.3d at 1142, holds that a motion to compel arbitration under the FAA that does not "cite[ ] the [state] Arbitration Act or any [state] cases supporting the enforcement of the state statutory equivalent of the FAA" will not be considered a motion under state law.  Cintas' motion relied solely on the FAA, not on any state statutory equivalents,[18] and cited state case law only to support its argument that arbitration should be compelled under the FAA.  If the FAA does not apply, its motion must be denied.

---

[15]   Declarations of Amber Kelly, Bryan Cruse, Earl Woods, Eric Anderson, Aaron Zadnik, Mark Fragola, Tom Jaramillo, and James White, all filed on October 2, 2003.

[16]   Declarations of Denise Murray, Glenn Larsen and Robert Jordan in Opposition to Motion for Facilitated Notice, all of which were filed on or about October 2, 2003.

[17]   Plaintiffs are also "transportation workers" under case law holding workers to be exempt where they have transportation-related job duties.  *Adkins.*, 303 F.3d at 505-6 (employees working in construction, landscaping, warehousing, etc., were not engaged in "transportation-related job[s]" so they were not "transportation workers"); *Kropfelder v. Snap-on Tools Corp.*, 859 F.Supp. 952, 958 (D.Md. 1994) (warehouse manager in company that sold and delivered tools to mechanics was not exempt because he was not "directly involved in the transportation business, although he has strong, close and rather immediate contact with those who are so involved," *i.e.*, the company's drivers who delivered goods to and from the warehouse).

[18]   Similarly, while Cintas now argues that arbitration clauses in the Michigan collective bargaining agreements are enforceable under Mich. Comp. Laws § 423.9(D), *see* Cintas Brief at 19, this statute was not cited before its supplemental brief.

PLTFS' SUPPLEMENTAL REPLY BRIEF RE: MOTION TO COMPEL ARBITRATION
Case No. C 03-01180 SBA

### III.   WITHOUT THE FAA, ARBITRATION OF PLAINTIFFS' FLSA CLAIMS CANNOT BE COMPELLED[19]

The Ninth Circuit has recognized that in the absence of the "FAA's strong policy in favor of arbitration," a contractual arbitration clause may be unenforceable as a means of resolving federal statutory claims, where arbitration conflicts with federal policies underlying those federal statutes. *Chappel*, 232 F.3d at 725 n.4.[20]   In *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 704-705 (1945), the Supreme Court invalidated an employee's pre-dispute waiver of the right to seek liquidated damages under the FLSA on the theory that a private right granted to effectuate a legislative policy may not be waived if the waiver will thwart the federal statutory policy.[21]   In *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740-45 (1981), the Court ruled that, because arbitration would not fully protect an employee's substantive rights under the FLSA, the employee's right to litigate an FLSA claim in court could not be waived in a collective bargaining agreement.  Thus, because arbitration will thwart the federal policies embodied in an employee's substantive rights under the FLSA, *id.* at 744-45, an individual arbitration agreement may not be enforced to bar litigation of the employee's rights under the FLSA, *Brooklyn Savings* at 704-5.

Cintas' attempts to upend this conclusion are unavailing.  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26-27 (1991), holds that arbitration agreements are not inconsistent with the purpose of the ADEA, but does not revisit the issue decided by *Barrentine* as to whether such a conflict exists between the FLSA and compelled arbitration.  In *Wright v. Universal Maritime*

---

[19]   Plaintiffs stand by their argument that this Court should not follow the dicta in *Chappel v. Laboratory Corp. of America*, 232 F.3d 719, 725 (9th Cir. 2000), opining that state law would apply, even if the plaintiffs' claims were exempt under the FAA.  Pltfs' Supp. Brief at 7-10.  If the exemption applies, state arbitration law should be deemed to be preempted, because the legislative history indicates that the exemption itself expressed an important public policy, which preempts contrary state regulation that would permit arbitration.  *Id.* at 9, n.4.

[20]   *See also Central States, Southeast and Southwest Areas Pension Fund v. Tank Transport, Inc.*, 779 F.Supp. 947, 951 (N.D. Ill. 1991) – a case cited by Cintas – where the Court found that compelled arbitration was inconsistent with the underlying purposes of ERISA.

[21]   Cintas tries to distinguish *Brooklyn Savings* as a case involving a waiver of damages not jury trial, but this distinction is irrelevant.  Plaintiffs rely on *Brooklyn Savings* to argue that an invalid waiver of statutory rights may be resident in an individual agreement and on *Barrentine* to argue that the waiver of judicial enforcement conflicts with FLSA policies.

*Service Corp.*, 525 U.S. 70, 76-77 (1998), the Supreme Court reaffirmed the vitality of *Barrentine*'s holding, while recognizing the "tension" between it and *Gilmer*, but declined to resolve the tension because there was no waiver of the statutory right to a judicial forum.  Because neither *Wright* nor any of the other cases cited by Cintas affect the ruling in *Barrentine*, they do not undermine plaintiffs' argument that their FLSA claims are not subject to arbitration.[22]

## IV.   ARBITRATION MAY NOT BE COMPELLED UNDER THE LAW OF ANY STATES RELEVANT HERE

In addition to plaintiffs' previous attacks on Cintas arbitration agreements as lacking in mutuality,[23] unsupported by consideration,[24] and unconscionable,[25] and on the arbitration clauses in

_____

[22]   Inexplicably, Cintas' contrary argument is grounded on wholly inapposite cases where the FAA applies.  Cintas Brief at 14, citing *Circuit City*, 532 U.S 105, and other FAA cases.

[23]   The agreements of plaintiffs in Arkansas, California, Indiana, Maryland, Michigan, and North Carolina are invalid for lack of mutuality.  Plaintiffs' Opposition to Motion to Compel Arbitration ("Opp.") at 5-12.  In its reply brief  at p. 3, Cintas previously conceded that the lack of mutuality renders the arbitration agreements unenforceable under Arkansas law.

[24]   Plaintiffs contend that none of the individual arbitration agreements are supported by legal consideration.  Opp. at 21-23.

[25]    The agreements of plaintiffs in Arkansas, California, Indiana, Maryland, Michigan, North Carolina, Colorado, Connecticut, Illinois, New York, and New Jersey are unconscionable. Opp. at 12-20, especially at 12 and n. 13.  These arguments are fortified by the fact that plaintiffs were forced to sign agreements that falsely stated that the FAA applies.  Supp. Brief at 13-15. Contrary to Cintas' suggestion, moreover, plaintiffs do not "acknowledge they understood they were agreeing the FAA would apply," Cintas Brief at 23, but rather contend that the contract they were induced to sign without knowledge of the arbitration clause contained a false term that renders the contract unconscionable in yet another way.

Although none of the plaintiffs subject to Cintas' motion to compel arbitration are from Florida or Nevada, Cintas has referenced the law of these states, apparently to address plaintiffs who opted in after the motion was filed.  As in other states, these arbitration agreements are unconscionable under Florida and Nevada law.  *E.g., Burch v. Second Judicial Dist. Court ex rel. County of Washoe*, 49 P.3d 647, 650 (Nev. 2002) (arbitration clause held unconscionable where it was a contract of adhesion buried in lengthy document, and plaintiffs were unsophisticated and not given a copy of the document); *Obstetrics and Gynecologists v. Pepper*, 693 P.2d 1259 (Nev. 1985) (refusing to enforce arbitration clause because it was not explained to plaintiff); *Romano ex rel. Romano v. Manor Care, Inc.*, 28 Fla. L. Weekly D2268 (Fla. Ct. App. 2003) (finding arbitration agreement unconscionable because it deprived the plaintiff of statutory  remedies including attorneys' fees); *Flyer Printing Company, Inc. v. Hill*, 805 So.2d 829 (Fla. Ct. App. 2001) (arbitration clause requiring employee to bear half of arbitration costs held unenforceable).

the Michigan collective bargaining agreements as unenforceable waivers of individual rights under the FLSA,[26] the inapplicability of the FAA gives rise to additional defenses to Cintas' motion to compel arbitration.  California, Arkansas, Colorado and North Carolina have statutes that preclude the compulsory arbitration of state labor claims.  Pltfs' Supp. Brief at 12.  By failing to contest their applicability, Cintas effectively concedes that these statutes bar arbitration of wage claims in these states.  *See* Cintas Brief at 16-19.[27]

Missouri and New Jersey have statutes imposing formal requirements for arbitration clauses.  Conceding that its arbitration agreements do not comply with Missouri law, Cintas argues that enforcing the requirement as written would produce "absurd results" and that its arbitration clause should be deemed sufficient notice, despite the failure to comply with Missouri law.  Cintas Brief at 18.  But a departure from legal requirements is not warranted here.

Unlike the cases cited by Cintas at page 18,  this is not a case where the contract itself was an arbitration agreement or where there was actual notice of the arbitration clause.  On the contrary, the arbitration clauses here are found in larger "employment agreements" billed by Cintas as "agreements not to compete," and most of the plaintiffs had no idea that they had signed a binding arbitration provision.  Declarations in Opposition to Motion to Compel Arbitration.  Missouri's statute is meant to protect individuals in precisely this type of situation, where

---

[26]  All Michigan plaintiffs are covered by the collective bargaining agreements which contain the unenforceable arbitration clauses.  *See* Opp. at 23-25.

[27]   In its opposition, Cintas relies in large part on cases that invoke, in passing, state law policy favoring arbitration, but are otherwise inapposite or unpersuasive.  Cintas relies, for example, on *City & County of Denver v. Dist. Court*, 939 P.2d 1353, 1364 n.11 (Colo. 1997), for Colorado's policy favoring arbitration, but disregards the Supreme Court's warning there that nothing in the case was intended to undermine the law that claims under the Colorado Wage Claim Act are *not* subject to arbitration.  Cintas also cites to several cases in which the *plaintiff* voluntarily invoked an arbitration clause in his or her contract, so its validity was not at issue. *Fink v. Golubock*, 680 A.2d 1243, 1250-52 (Conn. 1996); *Wachter v. UDV North America, Inc.*, 816 A.2d 668 (Conn. App. 2003); *Rauh v. Rockford Prods. Corp.*, 574 N.E.2d 636 (Ill. 1991); *Mislenkov v. Accurate Metal Detinning, Inc.*, 743 N.E.2d 286, 288 (Ind. App.  2001).  Finally, Cintas cites to cases where the plaintiffs were compelled to arbitrate but did not address the enforceability of the agreement at issue.  *Fastenberg v. Prudential Ins. Co.*, 707 A.2d 209 (N.J. Super. App. Div. 1998); *Flynn v. Labor Ready, Inc.*, 751 N.Y.S.2d 722 (N.Y. Sup. 2002).

1    arbitration clauses are buried in the middle of lengthy general contracts.  New Jersey's parallel

2    mandate that arbitration agreements be "conspicuous" invalidates the Cintas arbitration

3    agreements for the same reason.  *Discover Bank v. Shea*, 362 N.J.Super. 200, 208 (2001).

4    **V.    THE INAPPLICABILITY OF THE FAA ONLY STRENGTHENS PLAINTIFFS'
         ARGUMENT THAT THE COURT SHOULD STAY ANY ARBITRATION, NOT
5        THE CONTINUED LITIGATION OF THIS CASE.**

6            As plaintiffs have argued, the Court should address the stay issue only if some claims are

7    sent to arbitration.  In that context, there are strong policy reasons why the Court should stay any

8    arbitration, including to protect the rights plaintiffs have under the FLSA and parallel state statutes

9    to prosecute their claims on a representative or class-wide basis.  Opp. at 1-2.  If plaintiffs are

10   found to be exempt from the FAA, the need for a stay of arbitration is even more compelling.  The

11   Court's power to effectuate full relief on plaintiffs' FLSA claims will be impaired if parallel state

12   claims are arbitrated in a series of individual proceedings.  Further, this Court would be obligated

13   to enforce state law requirements that arbitration be stayed to permit litigation of plaintiffs' non-

14   arbitrable claims.[28]

15   DATED:   December 4, 2003              Respectfully submitted,

16                                          ALTSHULER, BERZON, NUSSBAUM, RUBIN &
                                              DEMAIN
17
                                            MILBERG WEISS BERSHAD HYNES & LERACH, LLP
18
                                            TRABER & VOORHEES
19

20                                          By___/s_____
21                                                   Theresa M. Traber
                                            Attorneys for Plaintiffs PAUL VELIZ, *et al.*
22

23   Filer's Attestation: Pursuant to General Order No. 45, Section X(B) regarding signature, Vanessa
     H. Eisemann hereby attests that concurrence in the filing of this document has been obtained.
24

25   _____

26        [28] *Blue Cross of Cal. v. Sup. Ct. (Farquhar)*, 67 Cal.App.4th 42, 47 (1998) (trial court
     granted motion to compel arbitration for certain class members, stayed all arbitration, and denied
27   motion to stay litigation); *Pioneer Take Out Corp v. Bhavsar*, 209 Cal.App.3d 1353, 1358 (1989)
     (same); *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789, 797 (Colo. App. 2001) (where
28   issues are intertwined but not all arbitrable, Colorado law favors resolving all issues in court).

PLTFS' SUPPLEMENTAL REPLY BRIEF RE: MOTION TO COMPEL ARBITRATION
Case No. C 03-01180 SBA                                                                          15

<u>DECLARATION OF SERVICE BY MAIL</u>

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 401 B Street, Suite 1700, San Diego, California 92101.

2.      That on December 4, 2003, declarant served the PLAINTIFFS' SUPPLEMENTAL REPLY BRIEF REGARDING DEFENDANT CINTAS CORPORATION'S MOTION TO COMPEL ARBITRATION, by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 4th day of December, 2003, at San Diego, California.

*Deborah S. Granger*

_____

DEBORAH S. GRANGER

CINTAS

Service List - 11/6/2003   (03-0100)

Page 1 of  1

**Counsel For Defendant(s)**

Mark C. Dosker
Michael W. Kelly
Joseph A. Meckes
Squire, Sanders & Dempsey L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA  94111-3482
   415/954-0200
   415/391-2493 (Fax)


**Counsel For Plaintiff(s)**

Michael  Rubin
Scott A. Kronland
Altshuler, Berzon, Nussbaum, Rubin & Demain
177 Post Street, Suite 300
San Francisco, CA  94108
   415/421-7151
   415/362-8064 (Fax)


Albert H. Meyerhoff
Milberg Weiss Bershad Hynes & Lerach LLP
355 South Grand Avenue, Suite 4170
Los Angeles, CA  90071
   213/617-9007
   213/617-9185 (Fax)

Theodore J. Pintar
Steven W. Pepich
Milberg Weiss Bershad Hynes & Lerach LLP
401 B Street, Suite 1700
San Diego, CA  92101-4297
   619/231-1058
   619/231-7423 (Fax)


Theresa M. Traber
Stefanie Kim Gluckman
Traber & Voorhees
128 North Fair Oaks Ave., Suite 204
Pasadena, CA  91103
   626/585-9611
   626/577-7079 (Fax)